

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| DOUGLAS V. RAHM, | Civ. No. 17-4018 |
| Plaintiff, | |
| v. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| TCF NATIONAL BANK, | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiff Douglas V. Rahm ("Plaintiff"), by and through his attorneys, Boyce Law Firm, L.L.P., and for his Complaint against Defendant TCF National Bank ("Defendant" or "TCF"), states and alleges as follows:

### JURISDICTION AND VENUE

1. Plaintiff, a male employed by Defendant from January 2, 2012 to September 30, 2015, brings this action under Title VII of the Civil Rights Act of 1964 ("Civil Rights Act"), 42 U.S.C. §2000e-2(a), as amended, and the Age Discrimination in Employment Act of 1967 ("ADEA"). As a result, this Court has subject matter jurisdiction of this dispute under 28 U.S.C. § 1331.

2. Under 28 U.S.C. § 1367, this Court has pendant jurisdiction of the state-law claims asserted herein.

3. Additionally, or alternatively, under 28 U.S.C. § 1332, this Court has diversity jurisdiction of the state-law claims asserted herein.

4. Under 28 U.S.C. § 1391, venue is proper in the District of South Dakota because a substantial part of the events or omissions giving rise to the claims occurred in the District of South Dakota.

## PARTIES

5. Plaintiff was at all times material hereto an employee of Defendant and a resident of Sioux Falls, Lincoln County, South Dakota.

6. TCF, a Delaware Corporation, with principal corporate offices in Wayzata, Hennepin County, Minnesota, was at all times material hereto, doing business in Sioux Falls, South Dakota.

## BACKGROUND

7. In early 2012, TCF started an operations center in Sioux Falls, South Dakota ("Operations Center"). The Operations Center conducted back-office operations functions and housed an operations center and a call center with approximately 200 employees.

8. In December 2011, TCF hired Plaintiff as Vice President, Operations Manager II, with the TCF Corporate Operations Department. TCF hired Plaintiff as "on-site head of operations" to manage the new Operations Center in Sioux Falls, South Dakota. At the time of his hire, Plaintiff was fifty-eight years of age.

9. Plaintiff's starting salary was $77,000 annually. TCF's benefit package included matching employer 401K retirement benefits and the potential for an annual bonus. TCF determined whether Plaintiff received bonuses based upon whether he had met TCF's expectations and objectives during that year.

10. In 2014, Plaintiff became the Vice President of Settlement Operations.

11. During his tenure at TCF, Plaintiff consistently received high marks on all performance evaluations, commendations from his superiors, and annual performance bonuses. He was specifically praised for his leadership abilities and relationships with staff.

12. In December of 2014 and January 2015, Christopher Germann, Plaintiff's then-supervisor, instructed Plaintiff to participate in a "360-degree survey," which was facilitated by the TCF Talent Management Department. The purpose of the 360-degree survey was to provide the reviewee anonymous feedback. Certain of Plaintiff's supervisors, managers, senior managers, and selected co-workers completed the survey of Plaintiff's performance. One of the individuals that reviewed Plaintiff urged Executive Vice President Jim LaPlante to fire Doug because, to paraphrase, Doug was just waiting for retirement.

13. During all relevant times, Ms. Janice Pyn ("Ms. Pyn") was employed as an Assistant Vice President at the Operations Center. Her position and work duties at TCF required her to report directly to Plaintiff.

14. On June 22, 2015, Ms. Pyn reported to Plaintiff that TCF staff and members of the management and supervisory teams at the Operations Center, including Jillian Maas and Levi Aesoph, had stalked and harassed her on three separate occasions.

15. Plaintiff reasonably and subjectively believed Ms. Pyn's allegations, because in their prior interactions, Plaintiff found Ms. Pyn to be honest and credible.

16. Plaintiff knew that Ms. Pyn was a single, divorced mother of four adopted Native American children, and he believed that Ms. Pyn's harassment might be motivated by her sex. Plaintiff believed that such harassment would be particularly effective because Ms. Pyn was a single woman living alone with four young children.

17. Plaintiff had a good faith, reasonable belief that the reported incidents of harassment and stalking violated the law.

18. TCF's corporate policies and procedures required Plaintiff to report and take appropriate action regarding any harassment.

19. On June 22, 2015, Plaintiff initiated a phone call to Ms. Jackie Morrow, a TCF Human Resources Generalist in Minneapolis, Minnesota, and based on Plaintiff's recommendation, Ms. Pyn reported the harassment that Ms. Pyn suffered.

20. Following this call, Plaintiff stated to Ms. Morrow that the harassment that Ms. Pyn suffered was "very disturbing," and that anyone in Ms. Pyn's position would be fearful for her and her family's safety.

21. Following this call, Ms. Morrow conducted a telephonic investigation of Ms. Pyn's claims and quickly dismissed Ms. Pyn's complaints.

22. Despite the actions of Plaintiff, individuals at TCF continued to harass Ms. Pyn.

23. In her second complaint to Plaintiff ("Second Complaint"), Ms. Pyn reported to TCF Human Resources that TCF employees had retaliated against her because she filed her First Complaint, that TCF Facilities Manager Gordon Mead told her to go "fuck [her]self" after Ms. Pyn asked him to quiet his activities during Ms. Pyn's team's conference call in the boardroom, and that TCF employees in the lobby/teller area of the Operations Center mocked her for lodging her First Complaint.

24. Like Ms. Pyn's First Complaint, Plaintiff reasonably and subjectively believed that Ms. Pyn's allegations in her Second Complaint were true. Plaintiff reasonably believed that such complaints were sexually motivated, and that he had a corporate obligation to take action regarding any such complaint.

25. Plaintiff reasonably believed that the inappropriate and derogatory comments toward Plaintiff relating to her First Complaint created an abusive working environment and created an atmosphere in which employees would be discouraged from bringing their concerns to management's attention.

26. On July 22, 2015, due to reports of continued sexual harassment, inappropriate communications, and offensive comments to Janice regarding her complaints, Doug held a meeting with TCF's operations managers and supervisors to address these issues. Managers and supervisors were instructed to relay this information to their staff, to review TCF's harassment policy, and to confirm in writing that these actions had been taken.

27. Plaintiff allowed Ms. Pyn to leave work on at least three occasions after she appeared visibly upset by the retaliatory remarks lodged against her.

28. Throughout August 2015, Plaintiff initiated weekly meetings with Vice President Dean Okkelberg and Vice President Daniel Glammeier to ensure that inappropriate conduct and harassing conversations were not taking place at the Sioux Falls Operations Center and to ensure that any such conversations would be stopped.

29. During one weekly meeting, Plaintiff learned that Senior Vice President Lou Burmann and Mr. Glammeier had attempted to circumvent the investigation of Janice's complaints by contacting, Leon Tazel, TCF's Vice President of Human Resources, to offer their support of Jillian Maas, one of the individuals accused of sexually harassing Janice.

30. On August 5, 2015, as part of a second on-site investigation of Ms. Pyn's complaints, Mr. Tazel interviewed Plaintiff. During that interview, Plaintiff supported Ms. Pyn's allegations, providing his observations and reports of inappropriate employee conduct toward Ms. Pyn. Specifically, he relayed the incident in which Gordon Mead, a friend of the two

individuals involved in the three stalking incidents that led to Ms. Pyn's First Complaint, told Ms. Pyn "to go fuck [her]self" when he was asked to work more quietly. He further offered that Ms. Pyn had always shown integrity in her performance and behavior as a TCF employee, that she had been rated an excellent employee on all her prior performance reviews, and that he viewed her complaints as honest and credible.

31. In Plaintiff's conversations and interactions with Mr. Tazel regarding Ms. Pyn's complaints of sexual harassment and retaliation, Mr. Tazel revealed his bias by expressing his frustration with Ms. Pyn's complaints and by attempting to intimidate Plaintiff. Mr. Tazel expressed that TCF's Human Resources Department was not equipped to handle this type of harassment complaint, suggesting that her initial complaint never should have been reported.

32. Following their interviews with Mr. Tazel, Ms. Pyn and other staff members reported to Plaintiff that Mr. Tazel had treated them in an accusatory and intimidating manner.

33. On September 3, 2015, Plaintiff participated in a conference call with Executive Vice President Jim LaPlante. Plaintiff voiced his concerns about ongoing reports of sexual harassment, inappropriate comments, and offensive comments toward Janice. He also relayed that he believed that Ms. Burmann and Mr. Glammeier had attempted to circumvent the investigation of her complaints by contacting Mr. Tazel. Plaintiff further indicated that he was supportive of her claims of sexual harassment and retaliation, and stated that, in his opinion, her reports of sexual harassment and retaliation were credible.

34. On September 12, 2015, TCF concluded its second on-site investigation and informed Ms. Pyn that it had concluded that there was no evidence to support her claims.

35.  Four days after the conclusion of the second on-site investigation, on September 16, 2015, TCF fired Plaintiff and reprimanded Ms. Pyn for her complaints in back-to-back meetings.

36.  Before September 16, 2015, Plaintiff had not been notified about a planned reduction-in-force, and he had not received any complaints about his performance.

37.  Later in the day on September 16, 2015, Mr. LaPlante told staff in a meeting that TCF would be hiring a new manager.

38.  After Plaintiff's termination at TCF, despite an alleged reduction in force, TCF continued aggressively to hire additional employees for the Operations Center and at other TCF locations.

39.  Mr. LaPlante assessed the needs of the Operations Center and made the decision to terminate Plaintiff's employment in August 2015, while the investigation of Ms. Pyn's Second Complaint was pending and at or near the same time as Plaintiff offered his testimony to Mr. Tazel in connection with that investigation.

40.  Upon information and belief, the managers and supervisors to whom Plaintiff had reported his concerns about the harassment and retaliation against Ms. Pyn also participated in and made the decision to terminate Plaintiff's employment.

41.  As a part of TCF's alleged reduction-in-force, TCF fired only two individuals, both of whom were over sixty years of age at the time.

42.  After Plaintiff's termination, Vice President Dean Okkelberg assumed Plaintiff's position at the TCF Sioux Falls Operations Center. At that time, Okkelberg was fifteen years younger than Plaintiff and substantially less qualified for the position than Plaintiff.

43. Upon information and belief, TCF and Mr. LaPlante had a history and pattern of terminating older employees who were at or around the normal retirement age.

44. When Plaintiff was informed that his employment with TCF was being terminated, he was told that his termination date would be September 30, 2015, and that he could choose to work through that date. He was also offered a severance package that listed September 30, 2015, as his termination date so that his severance benefits would begin to run from that date, and he understood this to mean that he would also be paid through September 30, 2015.

45. To support his staff through the transition, Plaintiff chose to remain on the job and continued to cooperate in providing the status of work projects in his department.

46. On September 18, 2015, Plaintiff was instructed to leave the premises. He did so, but, because no one told him otherwise, he continued to believe that his termination date would be September 30, 2015, and that he would continue to be paid through that date.

47. After Plaintiff rejected the eight-week severance package in exchange for a full release of any and all claims that TCF initially offered him, it paid him the minimum three weeks of severance pay that its policies require. Plaintiff's severance pay, however, ran from September 18, not September 30, and Plaintiff did not receive payment from September 18, 2015, through September 30, 2015, until several months later.

48. On November 9, 2015, Plaintiff filed a formal Charge of Discrimination with the South Dakota Department of Labor, Division of Human Rights, which was subsequently transferred to the Equal Employment Opportunity Commission ("EEOC") for Investigation.

49. Following its investigation, on December 20, 2016, the EEOC issued a Dismissal and Notice of Rights. A true and correct copy of the Dismissal and Notice of Rights is attached hereto as **Exhibit 1**.

## COUNT I

### *Violation of Title VII of the Civil Rights Act*
### *(Retaliation)*

50. Plaintiff incorporates Paragraphs 1 through 49, inclusive, as if fully restated herein.

51. TCF was an "employer" at all times material herein within the meaning of Title VII of the Civil Rights Act.

52. TCF is engaged in an "industry affecting commerce" within the meaning of Title VII of the Civil Rights Act.

53. Plaintiff was qualified for his position as Vice President, Operations Manager II, and later, Vice President of Settlement Operations at TCF.

54. Plaintiff engaged in protected conduct, including, but explicitly not limited to, assisting Ms. Pyn to file her original complaint to TCF's Human Resources Department, participating as a supportive witness in the investigation of Janice's sexual harassment and retaliation complaints, and working to ferret out and address further harassing and retaliatory conduct within his workplace.

55. Plaintiff's protected conduct opposed unlawful employment practices occurring at TCF.

56. Plaintiff reasonably and subjectively believed Ms. Pyn's allegations, and Plaintiff had a good faith, reasonable belief that the reported incidents of harassment violated the law.

57. TCF was aware of Plaintiff's protected conduct.

58. Plaintiff suffered termination, which is an adverse employment action, as a result of his engagement in protected activity as described in paragraphs 1 through 49, inclusive, including but explicitly not limited to, assisting Ms. Pyn to file her original complaint to TCF's

Human Resources Department, participating as a supportive witness in the investigation of Janice's sexual harassment and retaliation complaints, and working to ferret out and address further harassing and retaliatory conduct within his workplace.

59. A causal link exists between Plaintiff's protected activities and the adverse employment action.

60. TCF's retaliation against Plaintiff for engaging in protected activities is prohibited by Title VII of the Civil Rights Act.

61. TCF's retaliation against Plaintiff for engaging in activities protected by Title VII of the Civil Rights Act has caused him to suffer damages, including, but expressly not limited to, a loss in back pay and front pay, in an amount to be proven at trial.

62. TCF's retaliation against Plaintiff for engaging in activities protected by Title VII of the Civil Rights Act was intentional or done with malice and reckless indifference to Plaintiff's federally protected rights.

63. Because TCF's retaliatory employment practices were intentional or were done with malice or reckless indifference to Plaintiff's federally protected rights, Plaintiff is entitled to recover punitive damages.

64. Under Title VII of the Civil Rights Act, Plaintiff is entitled to his reasonable attorneys' fees, litigation expenses, and costs incurred in this action.

## COUNT II

*Violation of the Age Discrimination in Employment Act*

65. Plaintiff incorporates Paragraphs 1 through 64, inclusive, as if set forth fully herein.

66. TCF was an "employer" at all times material herein within the meaning of the ADEA.

67. TCF is engaged in an "industry affecting commerce" within the meaning of the ADEA.

68. At the time of Plaintiff's hire and subsequent termination at TCF, he was over the age of forty and is therefore a member of a class protected by the ADEA.

69. Plaintiff was qualified for his position as Vice President, Operations Manager II, and later, Vice President of Settlement Operations at TCF.

70. Plaintiff suffered termination, which is an adverse employment action, as a result of his age as described in paragraphs 1 through 49, inclusive.

71. Upon information and belief, Plaintiff's position was filled by a substantially younger employee.

72. TCF's discriminatory employment practices based on Plaintiff's age have caused him to suffer damages, including, but expressly not limited to, a loss in back pay and front pay, in an amount to be proven at trial.

73. The unlawful employment practices of which Plaintiff complains were intentional or done with malice and reckless indifference to Plaintiff's federally protected rights.

74. Because TCF's discriminatory employment practices were intentional or were done with malice or reckless indifference to Plaintiff's federally protected rights, Plaintiff is entitled to recover punitive damages.

75. Under the ADEA, Plaintiff is entitled to his reasonable attorneys' fees, litigation expenses, and costs incurred in this action.

## COUNT III

### *Violation of the South Dakota Human Rights Act*

76. Plaintiff incorporates Paragraphs 1 through 75, inclusive, as if set forth fully herein.

77. TCF was an "employer" at all times material herein within the meaning of the South Dakota Human Rights Act.

78. Plaintiff engaged in conduct protected by the South Dakota Human Rights Act, including, but explicitly not limited to, assisting Ms. Pyn to file her original complaint to TCF's Human Resources Department, participating as a supportive witness in the investigation of Janice's sexual harassment and retaliation complaints, and working to ferret out and address further harassing and retaliatory conduct within his workplace.

79. Plaintiff's protected conduct opposed unlawful employment practices occurring at TCF.

80. Plaintiff reasonably and subjectively believed Ms. Pyn's allegations, and Plaintiff had a good faith, reasonable belief that the reported incidents of harassment violated the law.

81. TCF was aware of Plaintiff's protected conduct.

82. Plaintiff suffered an adverse employment action due to his engagement in protected activity as described in paragraphs 1 through 49, inclusive, including but explicitly not limited to, assisting Ms. Pyn to file her original complaint to TCF's Human Resources Department, participating as a supportive witness in the investigation of Janice's sexual harassment and retaliation complaints, and working to ferret out and address further harassing and retaliatory conduct within his workplace.

83. A causal link exists between Plaintiff's protected activities and the adverse employment action.

84. TCF's retaliation against Plaintiff for engaging in protected activities is prohibited by the South Dakota Human Rights Act.

85. TCF's retaliation against Plaintiff for engaging in activities protected by the South Dakota Human Rights Act has caused him to suffer damages in an amount to be proven at trial.

86. TCF's retaliation against Plaintiff for engaging in activities protected by the South Dakota Human Rights Act was intentional or done with malice and reckless indifference to Plaintiff's federally protected rights.

87. Because TCF's retaliatory employment practices were intentional or were done with malice or reckless indifference to Plaintiff's protected rights, Plaintiff is entitled to recover punitive damages.

88. Under the South Dakota Human Rights Act, Plaintiff is entitled to his reasonable attorneys' fees, litigation expenses, and costs incurred in this action.

## COUNT IV

### *Wrongful Termination*

89. Plaintiff incorporates paragraphs 1 through 88, inclusive, of the Complaint as if fully stated herein.

90. Plaintiff reasonably and subjectively believed Ms. Pyn's allegations of harassment and stalking in her First and Second Complaints.

91. The reported incidents of harassment and stalking violated a clear mandate a public policy as expressed in SDCL ch. 22-19A.

92. Plaintiff had a good faith, reasonable belief that the reported incidents of harassment and stalking violated a clear mandate of public policy.

93. Plaintiff engaged in conduct that was consistent with a clear mandate of public policy, including, but explicitly not limited to, assisting Ms. Pyn to report the incidents of harassment and stalking, which are both unlawful and criminal, to TCF's Human Resources Department, participating as a supportive witness in the investigation of Janice's stalking, harassment, and retaliation complaints, and working to ferret out and address further harassing and retaliatory conduct.

94. Plaintiff's engagement in conduct that was consistent with a clear mandate of public policy motivated TCF's decision to terminate his employment.

95. The motivation for TCF's termination of Plaintiff's employment contravened a clear mandate of public policy.

96. TCF's termination of Plaintiff's employment therefore constitutes wrongful discharge. *See, e.g., Dahl v. Combined Ins. Co.*, 2001 S.D. 12, 621 N.W.2d 163.

97. TCF's wrongful termination of Plaintiff's employment has caused Plaintiff to suffer damages in an amount to be proven at trial.

98. Because TCF's actions were intentional or were done with malice or reckless indifference to Plaintiff's rights, Plaintiff is entitled to recover punitive damages.

## COUNT V

### *Wrongful Termination*

99. Plaintiff incorporates paragraphs 1 through 98, inclusive, of the Complaint as if fully stated herein.

100. Plaintiff reasonably and subjectively believed Ms. Pyn's allegations of harassment and stalking in her First and Second Complaints.

101. The reported incidents of harassment and stalking violated TCF's corporate policies and procedures.

102. TCF's corporate policies and procedures also required Plaintiff to report and take appropriate action regarding any harassment in his workplace.

103. Plaintiff had a good faith, reasonable belief that the reported incidents of harassment and stalking violated TCF's corporate policies and procedures, and that TCF's corporate policies and procedures required him to take action to prevent further harassment within his workplace.

104. Plaintiff engaged in conduct that was consistent with TCF's corporate policies and procedures, including, but explicitly not limited to, assisting Ms. Pyn to report the incidents of harassment and stalking, which violated TCF's corporate policies and procedures, to TCF's Human Resources Department, participating as a supportive witness in the investigation of Janice's stalking, harassment, and retaliation complaints, and working to ferret out and address further harassing and retaliatory conduct.

105. Plaintiff's engagement in conduct that was consistent with TCF's corporate policies and procedures motivated TCF's decision to terminate his employment.

106. The motivation for TCF's termination of Plaintiff's employment contravened TCF's corporate policies and procedures.

107. TCF's termination of Plaintiff's employment therefore constitutes wrongful discharge.

108. TCF's wrongful termination of Plaintiff's employment has caused Plaintiff to suffer damages in an amount to be proven at trial.

## COUNT VI

### *Intentional Infliction of Emotional Distress*

109. Plaintiff incorporates paragraphs 1 through 111, inclusive, of the Complaint as if fully restated herein.

110. TCF engaged in extreme and outrageous conduct by discriminating against Plaintiff on the basis of his age and by retaliating against him for engaging in protected activities.

111. TCF intended to cause or recklessly caused Plaintiff severe emotional distress.

112. TCF's conduct, in fact, caused Plaintiff to suffer severe emotional distress.

113. Plaintiff has suffered an extreme, disabling emotional response to TCF's conduct.

114. Plaintiff has been damaged, in an amount to be determined, in trial, as a result of TCF's intentional infliction of emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A. For Plaintiff's damages, including, but expressly not limited to, back pay, in an amount to be determined at trial;

B. For front pay in an amount to be determined at trial;

C. For punitive damages in an amount to be determined at trial;

D. For attorneys' fees, costs, and disbursements incurred herein; and

E. For such other and further relief as the Court deems just and equitable under the circumstances.

Dated this 13th day of February, 2017.

                                            Jason R. Sutton
                                            Meghann M. Joyce
                                            David C. Stoos
                                            BOYCE LAW FIRM, L.L.P.
                                            P.O. Box 5015
                                            300 S. Main Ave.
                                            Sioux Falls, SD 57117-5015
                                            jrsutton@boycelaw.com
                                            mmjoyce@boycelaw.com
                                            dcstoos@boycelaw.com
                                            *Attorneys for Plaintiff Doug Rahm*

## JURY DEMAND

Plaintiff hereby demands a jury trial on any and issues triable by a jury.